UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America,

        v.

Billy Wayne Brymer, III
and
Joel Leon Thomas, Jr.,

**CRIMINAL COMPLAINT**

CASE NUMBER: 12 – 10068M

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief.

**See attached Counts 1 and 2**

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is

based on the following facts:

**See attached Statement of Probable Cause**

Continued on the attached sheet and made a part hereof:     ☒ Yes   ☐ No

AUTHORIZED BY:  AUSA Alison S. Bachus

Lance Leising, Special Agent, Federal Bureau of Investigation
Name of Complainant

Signature of Complainant

Sworn to before me and subscribed in my presence,

MARCH 6, 2012
Date

at  Phoenix, Arizona
City and State

Steven P. Logan, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## Count 1

On or about February 29, 2012, in the District of Arizona, defendants BILLY WAYNE BRYMER III and JOEL LEON THOMAS, JR. did knowingly take by force, violence, and intimidation from the person and presence of Eric Carlin, money in the care, custody, control, management, and possession of Chase Bank located at 9790 West Peoria Road, Peoria, Arizona, and in the commission of the offense, BILLY WAYNE BRYMER III and JOEL LEON THOMAS, JR. did force Eric Carlin to accompany them without the consent of Eric Carlin, in violation of Title 18 U.S.C. §§ 2113(a), (d), (e) and 2.

## Count 2

On or about February 29, 2012, in the District of Arizona, defendant BILLY WAYNE BRYMER III did possess, use, carry and brandish a firearm, that is, a handgun, during and in relation to a crime of violence, and possessed a firearm, that is, a handgun, in furtherance of a crime of violence, that is, Armed Bank Robbery, as alleged in Count 1 of this Complaint, a felony prosecutable in a court of the United States, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i, ii).

## AFFIDAVIT OF PROBABLE CAUSE

Your Affiant, Lance Leising, being duly sworn, deposes and says to wit:

I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and am currently assigned to the FBI Phoenix Division's Violent Crime Squad. I have been employed as an FBI SA for approximately 14 years and have investigated hundreds of bank robberies. I am familiar with the facts regarding the February 29, 2012 robbery of the Chase Bank located at 9790 West Peoria Road, Peoria, Arizona. The following is a description of the robbery:

At approximately 7:39AM, the Federal Bureau of Investigation (FBI) and Peoria Police Department (PPD) responded to a bank robbery alarm at the Chase Bank located at 9790 West Peoria Road, Peoria, Arizona. Initial reports were that two employees were confronted by a gunman before opening the bank. The gunman forced his way to the vault and fled with a large amount of federally insured currency. Once investigators arrived on scene, the two Chase Bank employees were identified as Branch Manager Eric Carlin (Carlin) and Teller Joel Leon Thomas Jr. (Thomas). Carlin has been employed with Chase bank for approximately eight years and Thomas has been employed with Chase Bank for approximately two months. Thomas worked for Wells Fargo Bank prior to Chase Bank.

After arriving at the bank, your Affiant reviewed bank surveillance video and interviewed Carlin and Thomas. The following is a description of the robbery based on the video and the witness accounts: On Wednesday, February 29, 2012 at approximately

1

7:30AM, Carlin and Thomas arrived to open the branch. Pursuant to Chase Bank opening procedures, one employee enters the bank and the second employee stays outside to watch for suspicious activity. If the second employee sees anything suspicious, they are to contact the employee inside the branch and call 911 if necessary. For safety, employees are not supposed to enter the branch prior to opening if non-employees are near the bank's entrance. On this morning, Carlin was the first person to enter the bank and Thomas stayed outside in his car with a view of the bank's east side and main entrance. An ATM is located on the bank's south side, near the southeast corner, approximately 20 feet from the east entrance doors. From Thomas' position, he could see the bank's front doors and customers near the ATM.

As Carlin approached the main entrance, a landscaper was finishing near the front doors. Carlin did not see anyone else near the bank. Carlin waited until the landscaper began driving away to open the east doors of the bank. Carlin followed Chase Bank opening procedures by turning off the perimeter alarm and walking the interior of the branch to make sure the bank was secure. He then displayed a pre-arranged "all clear" signal that was visible through a window. This signal is meant to communicate to arriving employees that the interior of the bank is clear and it is safe to enter. Carlin then waited at the locked, east doors for Thomas to approach. From Carlin's position inside the bank, he had to rely on employees outside to advise him of suspicious activity near the ATM, because he could not see the ATM or anyone approaching the doors from the ATM.

During Thomas' interview, he explained how he watched Carlin enter the bank. He said that after Carlin entered, he noticed a tall, White male (Suspect) at the ATM, possibly wearing a dark hooded sweatshirt with the hood pulled up over his head. Thomas' description of the person was vague and seemed to change during the interview. Thomas said he saw the "all-clear" signal and began walking to the doors. When asked why he walked to the door when an unknown person wearing a hooded sweatshirt was standing nearby, he said that Carlin told him not to worry about customers at the ATM. When asked about that statement, however, Carlin denied telling Thomas or any employee to ignore ATM customers and disregard proper opening procedures.

Thomas told investigators that as he got within 10-20 feet of the front door, he saw the Suspect walk from the ATM toward the bank's front door, but his description of the Suspect was again vague. When Thomas was within 8-10 feet of the entrance, Thomas said that the Suspect lifted his shirt and showed Thomas a handgun tucked into his waistband. Instead of stopping, though, Thomas continued to walk toward the front door, at which point Carlin unlocked the door to allow Thomas to enter. Thomas quickly entered the bank and Carlin observed a "blur" coming from the south. Carlin soon realized that this "blur" was the Suspect wearing a dark grey hooded sweatshirt trying to follow Thomas through the door into the branch. In an effort to keep the Suspect out of the branch, Carlin pushed the suspect in his chest and tried to close and lock the door. As shown in the bank surveillance video, Carlin struggled to close and lock the door, but Thomas stayed approximately two feet behind

3

Carlin and did not appear to make any movement to help Carlin close and lock the door. Carlin was not able to lock the door and the Suspect pulled out a black, semi-automatic handgun that Carlin described as a 9mm. Carlin told investigators that he is very familiar with firearms and he was confident it was a 9mm handgun. The Suspect came inside the bank with the handgun drawn and pointed directly at Carlin.

Once inside the branch, the Suspect pulled a dark 3-hole ski-mask over his face. He made statements to the effect of, "I know how it works here. I know two girls who used to work here. Don't do anything stupid because I am willing to kill both of you and kill myself." The Suspect ordered Carlin and Thomas to the vault at gunpoint. Carlin explained that he is very familiar with guns and described the Suspect's gun as a 9mm semi-automatic handgun. Carlin walked to the vault, followed by the Suspect. The bank surveillance video shows that Thomas walked behind the Suspect, and the Suspect did not make any attempts to "control" Thomas or even look at Thomas while he forced Carlin to the vault. Based on your Affiant's experience, it is highly unusual for a bank robber to allow a victim out of his sight and especially unusual to allow a victim to walk directly behind him during the robbery. In this case, there were only two bank employees for the Suspect to watch and it would have been easy for him to maintain visual and physical control over them by having both victims walk in front of him.

Carlin walked to the vault room door, disabled the alarm and the three entered the vault room, which contains a large, two-door safe. Carlin and Thomas used their keys and

4

codes to open the left door of the safe. While near the safe, the Suspect spoke on a small, black, hand-held, two-way, walkie-talkie type radio that he had brought with him. He asked on the radio if there were any police outside or anything on the scanner. A deep, male voice on the radio responded "No" and said the back was clear.

The Suspect demanded money, so Carlin started to remove cash from the safe. The Suspect ordered Thomas to get him a bag. Thomas grabbed a small, black, Chase duffle bag from a shelf in the vault room and he and Carlin put the money from the safe in the bag. After taking the money from the main vault, the suspect told Carlin to open the right side door. This side contained individual "cubbies" in which tellers secure the money from their respective drawers. Carlin opened this door and Thomas used his key to remove the money from his "cubbie." Thomas' money was in a reddish-pink tote bag. Thomas handed this bag to the Suspect.

After the Suspect obtained the money from the safe, he said, "I want money from the ATM." Carlin lied and told him he could not get into the ATM or any other money in the vault. The Suspect ordered Carlin and Thomas to the men's bathroom at gunpoint. He ordered them to lie face down on the floor. The Suspect told them to wait five minutes, because he had to check on something and come back. The Suspect left with the black duffle bag and reddish-pink tote bag containing the money. After about one minute, Carlin got up and saw that the Suspect had left the bank. At 0739 hours, Carlin used his cell phone to call 911. An audit later revealed that the Suspect fled the bank with approximately a large sum

of federally insured United States currency.  Much of this currency was strapped and many of the straps contained a Chase Bank stamp indicating the branch's address or number.

While at the scene and prior to any interviews, Peoria Detective John White pulled all the investigators aside and said he had an open fraud case involving Thomas.  According to Detective White, Thomas was alleged to have participated in a bank scam while employed at Wells Fargo Bank involving fraudulent debit cards.  White advised that Thomas was associated with another suspect named Billy Wayne Brymer III, (Brymer).  Brymer was suspected of recruiting others to participate in the fraudulent debit card scam. Brymer is described as a White male, 22 years old, 6'4", 240 pounds with a muscular build.

During Carlin's interview, Carlin gave a very detailed Suspect description and account of what happened. Carlin described the Suspect as a White male, 230 lbs, 25-30 years old, 6'04" tall, muscular build, wearing a gray hooded sweatshirt with a Philadelphia Eagles "bird" logo on the left breast and "NFL" on the lower side, large women's sunglasses, black 3-hole ski mask, blue jeans, and black Adidas tennis shoes or suede skate shoes.  Carlin said the Suspect was clean cut with no facial hair.  Carlin advised that would be able to identify the Suspect because he saw the Suspect's face clearly before he covered his face with the ski mask.

During Thomas' interview, he provided a vague and sometimes contradictory Suspect description.  For example, Thomas said the Suspect had dark short hair, then later said he never saw his hair.  He also said the Suspect had a hood over his head and later contradicted

6

that statement.  He tried to explain these inconsistencies by saying that he was mixing up his criminal justice training that he has received in college courses with what he observed during the robbery.  Thomas did state, however, that the Suspect was a White male, mid-twenties, 6'4" with a muscular build.  Both Carlin's and Thomas' description of the Suspect match Brymer's physical description.

Further, your Affiant reviewed the bank surveillance video, which shows the Suspect at the ATM prior to the robbery and inside the bank during the robbery.  While the photographs from inside the bank do not show the Suspect's face, the photographs from the ATM show a relatively clear picture of the Suspect's face.  The Suspect appears to be a tall, White male, clean shaven, wearing a dark gray hooded sweatshirt with the hood up and large, brown women's sunglasses with tan lenses.  The face of the Suspect in the ATM surveillance photograph bears a strong resemblance to Brymer's Arizona Driver's license photograph.

In addition to providing some conflicting descriptors of the Suspect, Thomas also gave a suspicious explanation of why he entered the bank when an armed man was by the front door.  For example, Thomas said he saw the Suspect at the ATM and even saw the Suspect display the handgun before Thomas got to the door, but Thomas still continued to walk into the bank.  When questioned about his decision to enter the bank after seeing a hooded Suspect with a gun outside the bank, Thomas said he was not sure what the Suspect's intention was with the gun, because Arizona recently changed the law to make it legal to carry a concealed handgun.  Thomas also said that the Suspect never pointed the gun at him.

7

He also stated that Carlin had told him not to worry about ATM customers, which is contrary to the bank's procedures and denied by Carlin.

When investigators asked Thomas about whether he associates with anyone matching the Suspect's description, Thomas became visibly nervous. Thomas claimed that he does not regularly associate with any White male that matches that description. He said he works out at an LA Fitness with a Damion or Devon that matches the description, but he has not told that person where he works. Thomas claimed that he did not recognize or know the Suspect that robbed the bank. Thomas was not specifically asked about Brymer.

Thomas was asked if he would voluntarily submit to a polygraph test and he declined. He was also asked if he would voluntarily allow investigators to look at his mobile telephone and he refused. His mobile telephone was already in possession of police at the start of this interview. Investigators asked Thomas if he made any phone calls or text messages immediately prior to the bank robbery. Thomas said he only texted his girlfriend, Jasmine Huerta, but did not communicate with anyone else. Thomas said that after the robbery, he called his mother and his sister's school, but did not communicate with anyone else.

Thomas admitted that he had a handgun in his car at the time of the bank robbery. Thomas voluntarily left the interview and drove away from the scene in his black, 2011, Mercedes Benz 4-door sedan, Arizona plate ATG1056, VIN# XXXXXXXXXXXXXXXXX.

## SUBSEQUENT INVESTIGATION

At approximately 2:00PM that day, investigators established surveillance on Brymer's

apartment located at XXXX, Tempe, Arizona.  Brymer lives at this residence with his girlfriend, Jillian Bagley, age 19.  At approximately 3:00PM, investigators observed a black, 2-door, 2006 BMW registered to Brymer driving from this apartment complex.  The BMW was stopped and the driver of the BMW was identified as Ernest Lerma (Lerma), Hispanic male, 22 years old, 6'3", 230 pounds.  Lerma does not match the photograph of the Suspect captured on the Chase Bank ATM photographs just prior to the robbery.  In plain view on the rear floorboard of the BMW on the passenger side were two  small, black, hand-held walkie talkie devices.  Also in plain view in the BMW were a small stack of crisp, new $2 bills that do not appear to have ever been in circulation, as well as a large tub labeled "protein powder."  The vehicle was searched for weapons and secured pending a search warrant.  When Lerma was searched for officer safety, law enforcement found syringes, vials of liquid labeled as testosterone and steroids, and $367 in Lerma's pockets.  Lerma said he has not had a job in over six months.

Lerma consented to an interview and was driven from the stop location (951 S. Mill Avenue in Tempe) to the Tempe Police Department.  Lerma was advised that he was not under arrest, but since he was stopped and detained by officers, he was advised of his *Miranda* rights.  He said he understood the rights and spoke with investigators.  Lerma said that he spent the night of February 28, 2012 with Brymer and Bagley at their apartment in Tempe.   Brymer woke up Lerma early in the morning and told Lerma that he had to go before Bagley woke up and saw Lerma there.  Brymer told Lerma to take his BMW to the

west side of the Phoenix metropolitan area and to take Brymer's white flip phone with him. Brymer said he was going to drive to the west side to work out at a gym with some friends and he would call Lerma if he needed him. Lerma said he asked to go with Brymer, but Brymer would not allow him to go.

Lerma said he drove out to the west side and smoked some marijuana at a friend's house. Sometime between 7:00 and 8:00 AM, Brymer called Lerma and asked him to pick him near at a gym near 90th Avenue and Peoria Avenue. Lerma was not sure of the exact location, but said there was a CVS on the corner and a Chase Bank near a small gym. The Chase Bank at 9790 West Peoria is located in the parking lot of a strip mall containing a small gym and a CVS pharmacy on the corner.

Lerma told investigators that he arrived at that location and saw a black sedan drive away from the area at a high rate of speed. He said the sedan was being driven by a Black male with a bandana covering the lower half of his face. According to Lerma, Brymer called him again and told him to pick him up in a residential area behind the businesses. Lerma drove to the residential area and picked Brymer up along the street. Brymer appeared nervous and was wearing a grey Arizona Cardinals hooded sweatshirt. Lerma described the sweatshirt, and your Affiant showed him a surveillance image from the bank. Lerma identified the sweatshirt in the image as the sweatshirt that Brymer was wearing. Lerma was shown the ATM photograph of the Suspect and said that the Suspect looked like Brymer. Lerma said that Brymer was carrying something in his hands, such as a sweatshirt or other

clothing. Lerma said that Brymer told him to drive back to his apartment in Tempe, but to take the Loop 101 north around the north side of the Phoenix metropolitan area.

Lerma further stated that on the way back to the apartment, they were stopped by a DPS Officer. After Lerma was given a traffic citation for no license or registration, he and Brymer drove directly back to the apartment. Once inside, Brymer used his cell phone and Lerma was played video games. They stayed in the apartment until Brymer asked Lerma to drive him and Bagley to Arizona Mills Mall. Lerma drove Brymer and Bagley to Arizona Mills Mall and dropped them off in a parking lot. Brymer told Lerma to go back to the apartment and grab the large tub of protein powder and take all of the steroids. In reference to the protein powder, Brymer said he was "taking care" of him, but Lerma claimed that he did not know what was in the tub. Brymer also told Lerma to clean out his BMW. Lerma went back to the apartment and looked inside the large protein tub. He saw the grey Cardinals sweatshirt he saw on Brymer and in the bank surveillance photographs and some rolled up money. He left the apartment with the protein can. It was at this point that Lerma was stopped by the FBI. Lerma said that Brymer's iPhone 4 is in the passenger compartment of the BMW.

## SEARCH WARRANTS

### A. BRYMER'S APARTMENT

Investigators obtained search warrants for Brymer's apartment and BMW. Officers watched Brymer's apartment throughout the evening of February 29, 2012 until the execution

11

of a search warrant on the morning of March 1, 2012. Neither Brymer nor Bagley returned to the apartment. During the search of Brymer's apartment, investigators found steroids similar to the steroids found on Lerma's person and documents containing bank account numbers and personal information on dozens of individuals other than Brymer, Bagley, or Lerma. Further, investigators found a note written on a colored 3"x5" card that read, "Give me all the money from both drawers. No tracer packs. 20's 50's, 100's."

## B. BRYMER'S BMW

During the search of Brymer's BMW (VIN XXXXXXXXXXXXXXXXX), investigators found a large tub labeled "protein powder" that was partially filled with powder. In addition to the powder, the tub also contained a grey hooded Arizona Cardinals sweatshirt that appears identical to the sweatshirt worn by the Suspect during the bank robbery and $2790 in rolled-up $5 dollar bills. A $100 bill was also found in the center console, and $32 in crisp, uncirculated $2 bills were found in the BMW. Further, investigators found eleven 9mm bullets and three small, black Cobra brand, hand-held, two-way walkie-talkies that match the description of the radios used by the Suspect in the bank robbery. Investigators found the black, iPhone that Lerma identified as Brymer's in the passenger compartment. There was no serial number visible on the outside of the iPhone. Investigators also found empty or partially used super glue packets. Based on your Affiant's training and experience, some bank robbers use super glue on their hands and fingers during a robbery in an attempt to conceal their fingerprints. It should also be noted that the

surveillance video shows that the Suspect did not wear gloves.

In the trunk, investigators found a pair of women's sunglasses that appear identical to the sunglasses worn by the Suspect as he waited at the ATM prior to the robbery. Also in the trunk, investigators found 16 large, empty envelopes. Several of these envelopes were labeled with what appeared to be monetary amounts, such as "10K" and "5K." In between the driver's seat and the center console, investigators found another colored 3"x5" card that read, "Give me all money from top drawer and all strapped mo" (sic). Throughout the vehicle, investigators found receipts for the purchase of the vehicle, several receipts for vehicle service on multiple dates, and traffic citations – all in Brymer's name.

One traffic citation found in the car is dated February 29, 2012 at 8:07AM and indicates that Ernest Lerma was stopped driving Brymer's BMW east on the Loop 101 at MP 26 (near 7th Street) by Arizona DPS Officer C. Walker. If Brymer and Lerma would have driven north around the Loop 101immediately after the bank robbery, they would have been near MP 26 at the time they were stopped. Lerma was cited for no license and no registration. Investigators contacted DPS Officer C. Walker, who advised that she recalled stopping Lerma. She said that Lerma was driving and a large build, White male in his mid-20's was in the passenger seat. She said that both occupants appeared nervous and out of breath and told her that they had just come from the gym, but they were not wearing gym clothes. She gave them a citation without identifying the passenger and allowed them to leave.

13

Investigators also found a receipt from Dick's Sporting Goods at Fiesta Mall on February 29, 2012 at 3:16PM. The receipt indicates that a large backpack was purchased for $54.51 with $100 in cash. Investigators obtained video from Dick's Sporting Goods that shows three individuals matching Brymer, Lerma and Bagley's description involved in the purchase of the backpack. Brymer appears to purchase the backpack, then he leaves the store and returns to meet Bagley and Lerma. When Brymer returns, he is wearing the backpack which appears to be filled with something.

Investigators re-contacted Lerma at his parent's residence on March 2, 2012. Lerma was shown the Dick's Sporting Goods photographs and identified the individuals as Brymer, Lerma and Bagley. He then changed his earlier story and admitted that he drove Brymer and Bagley to Fiesta Mall, not Arizona Mills Mall and was with Brymer when he purchased the backpack. He said Brymer went to the car and loaded the backpack, while Bagley and Lerma stayed inside. Lerma claims not to know what was in the backpack. Lerma said he left Bagley and Brymer at Fiesta Mall and returned to Brymer's apartment to get the protein container and steroids. When questioned further about his involvement, Lerma appeared deceptive and refused to speak with investigators.

## C. THOMAS' iPHONE

On February 29, 2012, Peoria Police Department obtained a search warrant for Thomas' iPhone mobile telephone that was seized at the scene of the bank robbery. A search of the telephone revealed that on the day before the robbery, someone using Thomas'

14

telephone conducted three Google searches using the text strings "bank robber arrested Arizona" and "bank robber arrested."

The contact list of Thomas' iPhone listed the following contacts:

| Name | Email | Phone Number |
|------|-------|--------------|
| Billy | XXXXX | 480-XXX-XXXX |
| BZG | | 623-XXX-XXXX |
| Billy's Dad | | 602-XXX-XXXX |
| | | 602-XXX-XXXX |
| | | 602-XXX-XXXX |

Investigators sent court orders to Verizon and Sprint to confirm the subscribers of the above numbers, but the telephone companies have not yet responded.  However, public database checks show that 480-XXX-XXXX is a Verizon cellular telephone used by C.B., aka XXXX, aka XXXX.  B. is Brymer's mother and was interviewed by investigators on March 2, 2012.  Beecher told investigators that Brymer called her on March 1, 2012 from a number she did not recognize.  He seemed scared and told her that he was "in big trouble." Under the email address XXXX, the iPhone indicated "Recently E-mailed" with no further information.

Public database checks show that 623-XXX-XXXX is a Sprint cellular telephone. Brymer provided this number to the management office at his apartment complex as his telephone number.  On February 29, 2012, the maintenance employees at this complex called

623-XXX-XXXX and spoke with Brymer when he answered the telephone.

On March 1, 2012, investigators received a call from Billy Wayne Brymer Jr. (Brymer's father, hereinafter referred to as Brymer Jr.) using 623-XXX-XXXX. On March 3, 2012, investigators called 623-XXX-XXXX and spoke with Brymer Jr. Investigators met Brymer Jr at his residence and interviewed him regarding Brymer's whereabouts. Brymer Jr. claimed not to know Brymer's whereabouts. Investigators showed Brymer Jr. the bank surveillance photograph from the ATM and Brymer began crying. While Brymer Jr. would not tell investigators if he recognized the person in the photograph, Brymer Jr. received a call from an unknown male during the interview. Brymer Jr. spoke to this unknown male in front of the investigators. Brymer Jr. was heard explaining the evidence against his son to the unknown male. During this conversation, Brymer Jr. said something to the effect of, "They showed me a photo of someone outside the bank that looks like Billy (Brymer). That does not prove anything, because anyone could walk by a bank."

The above contact information for Brymer and Brymer Jr. in Thomas' iPhone shows that Thomas does know Brymer, contradicting Thomas' statements in the interview that he does not know anyone matching the description of the bank robbery Suspect.

A review of Thomas' text messaging and telephone calls prior to and immediately after the robbery not only show significant contact with Brymer, but also show that Thomas tried to delete his contact with Brymer. In the week prior to the bank robbery, Thomas contacted Brymer on one of Brymer's telephone numbers 53 times. 11 of these were text

messages and 42 were telephone calls ranging from 1 second in duration to 13 minutes and 34 seconds in duration.  In the day prior to the robbery, there were 21 contacts, 9 of which were text messages and 12 were telephone calls, including a 5 minute and 24 second call at 10:06PM on the night before the robbery.  The records obtained from the iPhone show that someone attempted to delete all of these contacts with Brymer, but investigators were able to retrieve the deleted contacts during the search.

On February 25, 2012 at 3:58PM, Thomas texted Brymer, "Radio on?"  This could be a reference to testing the hand-held radios that witnesses observed the Suspect using during the robbery.  At 2:08PM on the day prior to the robbery, Thomas sent Brymer a text message that read, "Want to meet downtown tonight?"  While investigators did not retrieve all messages being sent back and forth, they found that at 2:11PM, Thomas sent another text message that read, "Idk ["I don't know"] unless you find those guys to workout with then your (sic) gonna have to workout tomorrow sooo (sic) i just wanted to get a good training plan."  At 6:30PM that evening, Thomas sent a text message to Brymer's telephone and asked, "Want me to come to west 6?"  There is not another text message between Brymer and Thomas until after the robbery, specifically at 10:15AM on the day of the robbery.  This is a series of two text messages from Brymer to Thomas asking, "What time you off work today?," and saying, "dont (sic) remind me."  When Thomas received these messages, investigators had seized Thomas' telephone and were at the scene conducting interviews, so Thomas was not able to delete these messages.

An analysis of these text messages between Brymer and Thomas show the extent of their relationship and outlines their conspiracy to rob the Chase Bank. Thomas and Brymer arranged to meet downtown the evening prior to the robbery. The cryptic message regarding training plans is likely a reference to Thomas and Brymer developing a "good" bank robbery "plan" for the next morning. Based on your Affiant's training and experience, conspiracy to rob a bank, especially with the assistance of a bank employee, requires planning and preparation amongst the individuals involved. Suspects often meet to discuss these plans, rather than communicate over the telephone for fear that law enforcement can intercept these conversations. When it is necessary to discuss the plans via the telephone, the conversations are often cryptic, in an attempt to conceal the true nature of the conversation. In this instance, Thomas and Brymer discuss finding "guys to work out with" tomorrow and then developing a "good training plan" for tomorrow. Based on my experience, this is likely an attempt to discuss a meeting to develop a good plan for the bank robbery disguised as a meeting to plan a work out program. The text message later that day adds credence to this analysis. At 6:30PM, Thomas asks Brymer if he should come to west 6. West 6 is the name commonly used to refer to Brymer's apartment complex located on West Sixth Street in Tempe. This shows that Thomas and Brymer are in fact meeting as discussed earlier and likely discussing plans to rob the Chase Bank the next day.

The final communication between Brymer and Thomas is a text message from Brymer to Thomas after the robbery asking when Thomas will get off work. Brymer's and Thomas'

desire to meet after the robbery is consistent with typical bank robbery conspiracies. Based on your Affiant's training and experience, co-conspirators meet soon after the robbery to divide the robbery proceeds. This meeting normally happens shortly after the robbery, because not only do suspects want their share of the money quickly, but they also do not completely trust their co-conspirators with the entire take. This final communication between Brymer and Thomas shows that they planned to meet after the robbery to divide the proceeds. The frequent contacts between Brymer and Thomas, as well as the content of the text messaging, shows that Brymer and Thomas met the night before the robbery, planned the bank robbery for the following morning and instituted the plan the next day.

## BRYMER'S WHEREABOUTS

Investigators have interviewed several of Brymer's friends and family members. None of these individuals have seen Brymer since February 28, 2012. On March 1, 2012, Brymer contacted his mother and told her that he was in "big trouble" because of something he did on February 29, 2012. Brymer did not provide any further details. Bagley was scheduled to work at 5:00PM on March 2, 2012, but she contacted her employer on February 29, 2012 or March 1, 2012 and said that she could not make her shift because she was being "detained by the FBI." The FBI has not been able to locate Brymer or Bagley and their current whereabouts are unknown.

## CONCLUSION

Based on the above listed facts, your Affiant believes there is probable cause to charge

Billy Wayne Brymer III and Joel Leon Thomas, Jr.  with one count of Armed Bank Robbery

and Aid and Abet in violation of Title 18 U.S.C. §§  2113 (a), (d) and (e) and 2, and there is

probable cause of charge Billy Wayne Brymer III with one count of Use of a Firearm During

a Crime of Violence in violation of Title 18 U.S.C. § 924(c)(1)(A)(i, ii).


Dated this ___6TH___ day of ___March___, 2012.


Lance Leising
Special Agent, FBI


Subscribed and sworn to and before me this ___6TH___ day of March, 2012.


STEVEN P. LOGAN
United States Magistrate Judge